UNITED STATES of America,
Plaintiff,

v.

Eddie Louis DENTON, Jr., Defendant.

No. CR 02–2030.

United States District Court,
N.D. Iowa, Eastern Waterloo Division.

Feb. 16, 2005.

Christopher A. Clausen, Boliver Law Firm, Marshalltown, IA, for Defendant.

Stephanie Marie Rose, US Attorney's Office, Cedar Rapids, IA, for Plaintiff.

## MEMORANDUM OPINION RE: DEFENDANT'S COMPETENCY AT TRIAL

READE, District Judge.

Defendant Eddie Louis Denton, Jr. ("Denton"), having been convicted by a unanimous jury of participating in a drug conspiracy that spanned the years 1996–2001 and awaiting sentencing, seeks an order from this court finding that at the time of trial he was incompetent to assist in his own defense, setting aside the verdict and committing him to a federal medical facility.[1] The issue of Denton's competency was never raised until after conviction and after the presentence report draft was released in which it showed a guideline sentence computation of life imprisonment. Generally stated, Denton claims that the subdural hemotoma that he suffered in a fall on March 31, 2001 left him incompetent to stand trial on February 10 and 11, 2003. The real thrust of Denton's argument is that he must have been incompetent in February 2003 because he rejected a plea agreement that would have resulted in a sentencing guideline of 18–36 months in prison and took a chance that he would be convicted of an offense that would result in a sentencing guideline of life in prison. For the reasons stated herein, the court finds that Denton was not incompetent to stand trial, that he was able to and did competently assist in his own defense and that there is no basis to set aside his conviction.

### I. PROCEDURAL BACKGROUND

Denton was indicted on September 25, 2002 on the charge of conspiracy to com-

---

1. Denton requests placement with the "Department of Corrections." The court assumes he means the Attorney General of the United States for placement at a Bureau of Prisons ("BOP") facility. See 18 U.S.C. § 4241(d) (requiring a court, upon finding a defendant mentally incompetent to stand trial, to commit the defendant to the custody of the Attorney General for hospitalization and treatment at a suitable facility).

mit five crimes between early 1996 and at least December 2001:(1) distribution of 50 grams or more of cocaine base; (2) distribution of 500 grams or more of cocaine; (3) distribution of marijuana; (4) distribution of cocaine base within 1,000 feet of Sullivan park, a playground; and (5) distribution of cocaine base within 1,000 feet of Highland Park, all in violation of 21 U.S.C. § 846. Denton was represented by attorney Chris Clausen at his trial by jury on February 10–11, 2003. The jury returned a unanimous verdict of guilty.

On July 17, 2003, attorney Peter Berger filed a notice of appearance on behalf of Denton. Soon thereafter, Mr. Clausen filed a motion to withdraw, which was granted on July 29, 2003.[2] Sentencing was scheduled for September 18, 2003, but was continued at the request of the United States to October 3, 2003. On September 30, 2003, Denton first hinted at the possibility of raising the issue of his competency at the time of trial when he filed a motion to continue the sentencing because he wished to call a witness at sentencing to: (1) rebut the government's argument in favor of an obstruction of justice enhancement for alleged perjury at trial; and (2) support his motion for downward departure based on his mental health. Denton also stated that the proffered doctor's report "advances at least a threshold question about whether or not the defendant was competent to stand trial." Denton questioned whether there was a basis to file a motion for a new trial. At that time, Denton did not request a competency examination. Sentencing was rescheduled at Denton's request to November 25, 2003.

On October 6, 2003, Denton first requested a competency examination to determine whether he was competent to stand trial in February 2003. On October 17, 2003, the court ordered a complete psychiatric examination of Denton. Denton was examined at the Federal Medical Center in Butner, North Carolina by Angela Walden–Weaver, Staff Psychologist, and Kari Schlessinger, Psychology Intern, with psychiatric consultation provided by Robert Lucking, Staff Psychiatrist. Sentencing was rescheduled to December 10, 2003. Delays occurred with the BOP's scheduling of the examination because of a shortage of beds at the medical facility and by December 9, 2003, it was clear the results of the competency examination would not be available by December 10, 2003. The court received the results of the psychiatric evaluation by letter dated June 9, 2004. Dr. Weaver stated she believed Denton was competent at the time he committed the offense but, due to a lack of information, she could not make any determination within a reasonable degree of scientific certainty as to Denton's competency to stand trial in February 2003.

Denton was scheduled to be sentenced on July 30, 2004. At the sentencing hearing, the parties agreed the BOP would be furnished with additional information so Dr. Weaver could formulate an opinion regarding Denton's competency at the time of his trial. Dr. Weaver contacted defense counsel on or about August 4, 2004 and explained a court order would be required in order for her to re-address the issue of Denton's competency. On September 23, 2004, the court ordered Dr. Weaver to create a supplemental report based on the information supplied by the attorneys. Dr. Weaver was to formulate an opinion regarding Denton's competency in February 2003 using two standards: first, "within a reasonable degree of scientific certainty," and, second, "within a reasonable degree of scientific probability."

---

**2.** The reason for withdrawal was that Denton's family had retained attorney Bob Rehkemper. Apparently, Mr. Rehkemper is in practice with Mr. Berger.

Denton was not required to return to the medical facility. Supplemental information was sent by both attorneys to Dr. Weaver. Dr. Weaver provided a supplemental report to the court on November 29, 2004 in which she opined Denton was competent to stand trial in February 2003.

On January 31, 2005, the court held a hearing on the matter. Denton was personally present with his attorney, Peter Berger. Assistant United States Attorney Stephanie Rose represented the government. At the hearing, Denton offered evidence regarding his competency at the time of trial. Denton alleges he suffered a traumatic brain injury, which left him incompetent to assist in his defense and to understand the legal proceedings before and during trial. Following the court's questioning, Denton clarified that he is not claiming some intervening cause between trial and this date has also made him incompetent to be sentenced. Rather, Denton conceded, if the court finds that he was competent at the time of trial, he is also competent to be sentenced.

On February 8, 2005, pursuant to Denton's motion to reopen the record, the court admitted into evidence Dr. Naomi McCormick's report and Patricia McCollom's unsigned affidavit. On February 9, 2005, the court granted Denton's motion to substitute an executed affidavit in place of Ms. McCollom's unsigned affidavit.

Finding the competency issue to be fully submitted, the court turns to address the merits.

## II. FACTUAL BACKGROUND

The following evidence was presented at the January 31, 2005 competency hearing:[3]

On March 31, 2001, Denton fell while working as a liquor store clerk and hit his head, sustaining a subdural hematoma.[4] He lost consciousness for an unspecified period of time. On April 1, 2001, Denton went to the emergency room for an evaluation and cervical spine X-rays. On April 10, 2001, Denton returned to the emergency room complaining of dizziness, right-sided headache and weakness in his left leg and arm. A CT scan revealed a large fronto-parietal convexity subdural hematoma approximately 2 cm thick causing a 1.5 cm right to left shift. The right lateral ventricle was effaced as a result of the shift and the left temporal horn was obliterated. Denton was taken to emergency surgery and burr holes were drilled to drain the subdural hematoma. A follow-up CT scan on April 11, 2001 showed significant marked interval improvement in the mass of the hematoma and no further fluid accumulation. Another follow-up CT scan on May 5, 2001 revealed residual subdural fluid of approximately 0.5 cm by 1.0 cm. Tests conducted at the University of Iowa Hospitals and Clinics indicated that Denton suffered from a traumatic brain injury with mild to moderate impairments in anterograde memory, speed of information processing, visuoperceptual discrimination and reported personality changes.

In May 2001, Denton's private physician, Dr. Russell Adams,[5] diagnosed Denton

---

3. Additional facts will be discussed in the analysis section.

4. Denton failed to provide the court with medical records for the period of time between his injury and Dr. Naomi McCormick's August 2001 psychological evaluation. The government does not appear to contest the extent of Denton's injuries and subsequent

medical treatment. Therefore, the court will rely upon Denton's statement of facts regarding his medical treatment in April and May 2001.

5. Denton did not provide any information regarding Dr. Adams' background. The court notes Denton's medical records indicate Dr.

with dementia, memory problems due to the head injury, and brain injury symptoms with memory deficits. Apparently, Denton sought and received workers' compensation.

On August 14, 2001, Dr. Naomi McCormick, a clinical health psychologist, met with Denton and his daughter, Nichelle Nash, for a one-hour diagnostic interview for Denton's workers' compensation care manager. Def. Ex. Q at 7–10.[6] Dr. McCormick's notes from the interview indicate Denton was experiencing chronic headaches, difficulty communicating and concentrating, lack of patience, reduced energy levels, lack of balance and memory problems. *Id.* at 7–8. Dr. McCormick measured Denton's mental status through the Neurobehavioral Cognitive Status Examination. *Id.* at 8. Dr. McCormick determined Denton's language comprehension, repetition, constructional ability, calculations or mental arithmetic and social judgment were normal. *Id.* Denton exhibited mild impairment in the ability to name objects represented in pictures. *Id.* Denton's attention and abstract reasoning were moderately impaired. *Id.* Finally, Dr. McCormick determined Denton's delayed memory after learning new material was severely impaired. *Id.* at 9. Based on Denton's mental status, Dr. McCormick recommended that workers' compensation cover three additional hours of psychological testing. *Id.* at 10.

On August 14, 2001, Dr. McCormick met with Denton and Ms. Nash for one hour and administered the Cognitive Behavior Rating Scale ("CBRS"). *Id.* at 2. According to Dr. McCormick, "[t]he CBRS is designed to allow a family member or oth-er reliable observer to rate the presence and severity of cognitive impairment, behavioral deficits, and observable neurological signs." *Id.* The CBRS indicated Denton was moderately to severely impaired in the areas of depression, cognitive deficits, and memory disorder compared to other individuals in his age range who had not suffered brain injuries. *Id.* at 2–3. The CBRS further indicated Denton suffered from severe to very severe impairment in the areas of language deficits, apraxia (motor skills and procedural sequences), disorientation and dementia. *Id.* at 3.

On August 29, 2001, Dr. McCormick met with Denton and Ms. Nash for two hours, during which time Dr. McCormick conducted a psychological evaluation for Denton's workers' compensation care manager. *Id.* at 2–6. Dr. McCormick's notes from such evaluation indicate Denton had a IQ of 89, indicating low average intellectual abilities overall. *Id.* at 4.

Patricia McCollom, an R.N. who provides medical case management services and develops life care plans for individuals with catastrophic injuries, saw Denton in December 2001 at the request of Denton's workers' compensation insurance company. Def. Ex. E at 1. In her report, Ms. McCollom noted she met with Denton and his daughter, Nichelle Nash. *Id.* Ms. Nash stated that since his head injury, Denton was forgetful, often confused, hurtful to his family, and he stopped socializing. *Id.* at 1–2. Ms. McCollom referred Denton to Dr. Joseph Nora for outpatient cognitive therapy and learning, as well as counseling to deal with the adjustment to disability. *Id.* at 2.

Adams was Denton's primary physician when Denton had heart surgery in 1999, *see* Def. Ex. C at 64–84, so the court assumes Dr. Adams is not a brain injury specialist.

6. The court is using the actual page numbers of this exhibit rather than the numbers typed on the exhibit because Defendant's Exhibit Q includes two separate reports which each begin with page 1.

Denton attended outpatient therapy at Covenant Medical Center in Waterloo, Iowa following his injury. *See* Def. Ex. C. On March 6, 2002, Matthew Dunning, a speech language pathologist, met with Denton. *Id.* at 59. Mr. Dunning administered the Ross Information Processing Assessment–Geriatric test to Denton. *Id.* Mr. Dunning reported:

> Mr. Denton performed and responded to most questions accurately, however, a delayed response time was frequently noted. Immediate and recent memory tasks were performed with 100% accuracy, again with delay noted while responding. Temporal orientations, spacial orientation and orientation to environment was performed without error. Subtest VI, recall of general information: this subtest was performed with 100% accuracy, however, a delay in responses was noted. Subtest VII, problem solving and abstract reasoning: 100% accurate. Subtest VIII, organization of information: Again, 100% accuracy was achieved, however, with delayed responses for all questions. Auditory Processing and Comprehension was performed with 100% accuracy.

*Id.* The other reports in Defendant's Exhibit C dated after Denton's head injury relate to Denton's balance problems rather than any problems which could hinder his ability to assist in his defense. *See id.*

On May 29, 2002, Denton was discharged from speech therapy rehabilitation by Mr. Dunning due to his substantial progress. Def. Ex. B at 42. Mr. Dunning summarized Denton's progress in the following areas:

> Mr. Denton reports that at home he is focusing more on what he does and on things in his environment, as well as how he does it. He states that he is initiating more and recognizing tasks needing to be done at home. He states that before he would not have realized or recognized that something needed to be done. Mr. Denton also independently writes things down on his own in order to remember them. For instance, Mr. Denton goes to the store with a note of things to be purchased so he does not forget them. He also uses a daily planner which he states has been effective. He writes his appointments down and reviews them daily. He feels this helps him not only to remember where to be and when, but also improves his overall memory. He checks his book each morning to review things to do or appointments to be kept. Mr. Denton finds this to be a very effective tool and will continue to use it.

> In therapy, Mr. Denton has improved his overall memory skills with the use of compensatory strategies. He follows three-step verbal directives with 90–95% accuracy. Mr. Denton completes thought organization and reasoning tasks with 85% accuracy. He has also shown significant improvements with his ability to recall information from a paragraph and utilizes both verbal rehearsal and rescanning of a story prior to responding to questions. He is able to recall 90% of information from a seven paragraph story. Eddie has also decreased his overall response time during both structured tasks and informal conversation.

*Id.*

On June 6, 2002, Dr. Nora met with Denton and his granddaughter for a check-up. Def. Ex. B at 28. Dr. Nora stated in his notes that he received a report from occupational therapy that Denton was using memory aids, schedules, and other things to help with his organization. *Id.* Dr. Nora also received a report from speech therapy that Denton has "success-

fully transferred over on a day to day basis, he is initiating and recognizing tasks that need to be done at home using a daily planner, notes, etc." *Id.* Dr. Nora stated Denton brought his calendar to the appointment and items were lined up appropriately. *Id.* Rather than continuing the monthly checkups, Dr. Nora decided quarterly checkups were appropriate. *Id.*

On October 17, 2002, Dr. Nora sent a letter to Denton's workers' compensation insurance company and Ms. McCollom in which he concluded Denton had reached maximal medical improvement following his March 2001 traumatic brain injury. *Id.* at 22.

Denton was examined at the University of Iowa Neurology Outpatient Clinic on several occasions between November 8, 2001 and November 22, 2002. *See* Def. Ex. A. Neuropsychologist Steven Anderson oversaw a neuropsychological re-evaluation of Denton on November 22, 2002. *Id.* at 6. The notes from such re-evaluation indicate Denton's "behavioral changes remain the most prominent aspect of [Denton's] presentation. . . ." *Id.* Dr. Anderson determined Denton's nonverbal planning was impaired with milder deficits in Denton's verbal learning. *Id.* Denton's visuoperceptual discrimination improved from the first to the last evaluations. *Id.* Dr. Anderson also noted, "[p]erformances on tasks of auditory attention, working memory, speeded word finding, visuospatial processing, visuoconstruction, and bilateral manual dexterity remained broadly preserved." *Id.* Dr. Anderson's recommendations focused on Denton's behavior, driving, and future re-evaluation in order to track Denton's continued progress. *Id.*

On July 26, 2004, after Denton's conviction in this case, Ms. McCollom met with Denton at the Linn County Jail at the request of defense counsel. Def. Ex. E at 2. During such meeting, Ms. McCollom noted Denton could name the current month and year, state his location and the community, follow three-step commands, and recall three words after five minutes. *Id.* Denton recalled Ms. McCollom's first name, recognized her and recalled that she had been involved in assisting him. *Id.* Ms. McCollom noted Denton could not immediately respond to the day and date or name the prior three presidents of the United States. *Id.* Ms. McCollom further noted Denton could not remember her last name or how she had helped him in the past. *Id.* According to Ms. McCollom, Denton gave long rambling responses to direct questions. Based upon a total of one hour of interaction with Denton and a review of his prior medical records, trial testimony and sworn affidavits of his children, Ms. McCollom concluded "1.) Mr. Denton has cognitive and behavioral deficits related to brain injury of March 31, 2001, which affect his ability to function; [and] 2.) Mr. Denton requires a structured environment, best provided by his family, to promote his health, well-being and stability, due to these deficits." *Id.* at 3. Ms. McCollom then opined that because such deficits are chronic and appeared both before and after trial, Denton must have been unable to participate in his defense at trial in February 2003. *Id.* at 3–4. Ms. McCollom did not refer to the governing legal test for competency at trial. She attributed one long-winded response at trial and his testimony that he was helping police rather than perpetrating crime to be indicative of his behavioral and cognitive deficits.

On June 9, 2004, the court received the evaluation report of Dr. Weaver, Ms. Schlessinger, and Dr. Lucking. In their report, Dr. Weaver noted that during the four months Denton remained at the Federal Medical Center for evaluation, "[h]is memory functioning appeared to be intact

for immediate, recent, and remote recall .... [and he] was alert and oriented to person, place and time." Pl.Ex. 1 at 8. Denton was informed of the reason for the psychological testing and he "understood instructions readily and did not appear to have difficulty with hearing, vision, speech, or motor control." *Id.* In evaluating Denton's competency, Dr. Weaver relied upon the following items: (1) the results of the tests [7] administered while Denton was under observation at the medical facility; (2) the court's October 17, 2003 order that BOP conduct a complete psychiatric examination; (3) the court's December 9, 2003 [8] order for a report regarding the status of BOP's competency examination; (4) the Indictment; (5) the Presentence Investigation Report dated June 23, 2003 and revised in July 2003; (6) Drug Enforcement Administration and Waterloo Police Department investigation reports; (7) jury trial transcripts (Volumes I and II) from February 10 and 11, 2003; (8) Denton's exhibits; (9) medical records from Allen Memorial Hospital, University of Iowa Hospitals and Clinics, Covenant Medical Center, Dr. Adams, and Dr. Nora; and (10) phone interviews with Mr. Berger, and Danielle Plaehn, Mr. Clausen's legal assistant. Dr. Weaver stated it was her opinion that "on February 10 and 11, 2003, Mr. Denton understood the nature and consequences of the proceedings against him." *Id.* at 14. Dr. Weaver and the other evaluators opined, "With respect to responsibility, it is our opinion that Mr. Denton did not have a severe mental disease or defect and was therefore able to appreciate the nature, quality, or wrongfulness of his actions." *Id.* However, Dr. Weaver was unable to give an opinion as to Denton's ability to assist in his defense at trial because of certain missing information. *Id.* Specifically, Dr. Weaver noted she could not form an opinion because of the following factors: (1) conflicting information; (2) the lack of Denton's medical records from February 2003; and (3) the lack of opportunity to speak with Mr. Clausen, the attorney who represented Denton at trial. *Id.* Based on the information available to her, Dr. Weaver stated she believed the "weight of the evidence suggested Mr. Denton was not competent at the time of trial." *Id.*

The attorneys provided Dr. Weaver with the requested medical records and trial transcript and made Mr. Clausen available by telephone to Dr. Weaver. The court ordered Dr. Weaver to conduct a supplemental evaluation with the new information in order to render an opinion within a reasonable degree of scientific certainty and scientific probability as to Denton's ability to assist in his own defense in February 2003. In creating a supplemental report regarding Denton's competency, Dr. Weaver relied upon the items previously relied upon, as well as the following

---

7. The following tests were administered to Denton during his stay at the BOP medical facility: (1) a physical examination; (2) the Wechsler Adult Intelligence Scale—Third Edition ("WAIS–III"), an IQ test; (3) the Validity Indicator Profile ("VIP"), which measures test-taking attitude and response styles and is especially useful in facilitating interpretation of cognitive or neuropsychological assessment; and (4) the Minnesota Multiphasic Personality Inventory—Second Edition ("MMPI–2"), an assessment of personality characteris-

tics and overall level of emotional adjustment. *Id.* at 2, 8–10.

8. Dr. Weaver indicates she relied upon an order dated December 24, 2003. No order was issued on that date. The order dated nearest to December 24, 2003 regarding the issue of competency is the court's December 9, 2003 order requiring the government to file a status report on the BOP's competency examination. The court assumes this is the order to which Dr. Weaver referred in her report.

additional items: (1) the court's September 23, 2004 order that BOP conduct a supplemental examination; (2) a telephone interview with Nancy Raffensperger Newhoff on October 18, 2004; (3) a telephone interview with nurse Joan Feltes of the Linn County Jail on October 15, 2004; (4) an October 13, 2004 letter from Denton to Mr. Berger; (5) an October 13, 2004 letter from Denton to Dr. Weaver; (6) a telephone interview with Mr. Clausen on October 6, 2004; (7) an e-mail message from Mr. Clausen to AUSA Rose dated September 24, 2004; (8) an e-mail message from Ms. Rose to Dr. Weaver dated August 17, 2004; (9) two sets of questions and answers from Mr. Clausen; (10) Ms. McCollom's Report of Assessment dated August 13, 2004; (11) affidavits of Leighton Nash, Nichelle Nash, Michael Denton, Sr., and Jerry Nash, Denton's children; (12) Application for Further Mental Evaluation dated August 6, 2004; (13) transcript excerpt from Motion to Continue hearing on July 30, 2004; (14) three articles from the Waterloo Courier; (15) Dr. McCormick's Confidential Psychological Evaluation and Confidential Diagnostic Interview; (16) medical progress notes from Dr. Adams dated April 6, 1995 to February 13, 2003; and (17) BOP files. Pl.Ex. 2 at 2.

On October 25, 2004, the court received the supplemental evaluation report of Dr. Weaver and Dr. Lucking. In the supplemental report, Dr. Weaver relied upon Mr. Clausen's statements that he and Denton interacted at the defense table, Denton did not have problems understanding the testimony, Denton alerted Mr. Clausen to questions that should be asked of the witnesses, and Denton and Mr. Clausen discussed Denton's decision to testify. *Id.* at 7. Dr. Weaver also pointed out the fact Mr.

Clausen reported he was aware Denton had a head injury and did not raise the issue of Denton's competency prior to trial because "Denton seemed to have a 'good understanding of the elements of the offenses charged, a good grasp of the facts alleged, a good recollection of his explanation of the events alleged as well as a good understanding of the court procedures.'" *Id.* at 8–9. Mr. Clausen asked a physician to review Denton's medical records but Mr. Clausen and the physician did not find anything to support a claim of incompetence to stand trial. *Id.* at 9.

Regarding Denton's memory problems, Dr. Weaver noted that family members and medical records indicated Denton had memory problems, but Dr. Weaver found evidence that such "memory problems were not severe or debilitating." *Id.* at 10. Dr. Weaver stated that there was evidence Denton experienced slow information processing, but she pointed out Mr. Clausen reported that Denton had no problems tracking information during trial. *Id.* With regard to Denton's poor judgment, Dr. Weaver determined Denton utilized poor judgment prior to his head injury based on reports from Denton's fellow law enforcement officers that Denton engaged in shady behavior when he was a police officer. *Id.* "In view of the additional information, it is [Dr. Weaver's] opinion (within a scientific degree of certainty and probability) that Mr. Denton was competent to stand trial in February 2003." *Id.* at 12.

Mr. Clausen testified at the January 31, 2005 hearing that Denton needed him to speak slowly and repeat himself frequently in order to understand what was going on. Rptr. Notes at 26.[9] Mr. Clausen stated one possible explanation for why he had to

---

9. Because no official transcript has been created, the court will cite the court reporter's notes.

repeat himself was that Denton had a mental problem, but Mr. Clausen believed it was more likely that Denton did not accept what Mr. Clausen was telling him, i.e., that although he could impeach the government's witnesses against Denton, the witnesses' testimony would be admissible and quite possibly sufficient that a jury would convict him on that testimony alone. *Id.* Mr. Clausen testified he did not feel it necessary at any point during his representation of Denton to have Denton's competency evaluated. *Id.* at 49. Mr. Clausen is convinced Denton had the ability to consult with him and he had a reasonable degree of understanding about his case, including the facts and proceedings, and the role of each attorney, the judge and jury. *Id.* at 50. Mr. Clausen did not observe any irrational behavior of Denton other than rejecting the generous plea agreement, but Mr. Clausen noted that other defendants he has represented have rejected generous plea offers. *Id.* at 50–51. Mr. Clausen stated defendants frequently reject plea agreements because they cannot accept the situation in which they find themselves. *Id.* at 51. Mr. Clausen stated he thinks that during trial Denton understood what the witnesses were saying, Denton was able to consult with him about the witnesses' testimony and questions Denton wanted Mr. Clausen to ask, together they weighed the pros and cons of the various witnesses, and discussed the evidence. *Id.* at 53. Mr. Clausen was convinced Denton understood the evidence presented at trial. *Id.* Mr. Clausen could not recall any of Denton's family members, friends or associates approaching him and raising concerns about Denton's competency prior to the guilty verdict even though family members were called to testify at trial. *Id.* Denton's behavior was typical of other criminal defendants except that he was more respectful and polite than many defendants in that he

was very deliberate and precise in what he said. *Id.* at 55.

Mr. Clausen testified he reviewed the plea agreement with Denton. *Id.* at 41. Mr. Clausen believed the government was being very generous with its offer. *Id.* Mr. Clausen discussed Denton's options with him and explained there was a very high probability Denton would be convicted if he went to trial. *Id.* Mr. Clausen also explained to Denton that if he pled guilty, he would likely receive a sentence of 18–36 months in prison, whereas he would likely receive a life sentence if he went to trial. *Id.* at 44. Denton decided he preferred to take his chances at trial because he felt the jury would believe his testimony over the testimony of convicted felons. *Id.* at 43.

Danielle Plaehn testified she worked as a legal assistant for Mr. Clausen during and before Denton's trial. *Id.* at 63. Ms. Plaehn testified Mr. Clausen told her that they needed to put everything regarding Mr. Denton in writing, as they did with many of their clients. *Id.* at 70–71. Ms. Plaehn believed the action of putting everything to Denton in writing was routine. *Id.* at 75. Mr. Clausen also told Ms. Plaehn he needed to repeat himself because Denton would not remember something Mr. Clausen had previously told him. *Id.* at 71. Ms. Plaehn was not present at Denton's trial and did not participate in the phone calls and meetings between Mr. Clausen and Denton. *Id.* at 80–81. Ms. Plaehn believed the difficulties with Denton arose out of a lack of acceptance for his situation rather than a lack of understanding of the proceedings. *Id.* at 81–82.

At the January 31, 2005 hearing, Ms. McCollom testified that her role in meeting with Denton between December 2001 and October 2002 "was to clarify for the [workers' compensation] insurance company the current recommended treatment plan and then to implement that treatment

plan and see it through to completion in order to assist [Denton] to be the best that he could be in terms of his recovery." *Id.* at 96. Ms. McCollom conceded that the more times Mr. Clausen spoke to Denton regarding the plea agreement, the more likely it was that he understood it. Ms. McCollom also agreed that the fact the plea offer was reduced to writing and given to Denton to review on his own also increased the likelihood that Denton understood it. *Id.* at 128–29.

Denton offered five affidavits from his children, Michael Denton, Sr., Yvette Denton, Jerry Nash, Leighton Nash, and Nichelle Nash. The affidavits relayed anecdotes about Denton's poor driving skills, short temper, poor balance, poor memory and odd behavior following his brain injury. Most of these appear to reference post-surgery experiences rather than specifically focusing on Denton's experiences on February 10 and 11, 2003.

Finally, the government offered into evidence the plea agreement which Denton rejected prior to trial.

### III. COMPETENCY

■■■ "Due process prohibits the trial and conviction of a defendant who is mentally incompetent." *Vogt v. United States,* 88 F.3d 587, 590 (8th Cir.1996) (citing *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975)). This prohibition is the " 'substantive' competency principle." *Id.* " '[D]ue process [also] requires that a hearing be held whenever evidence raises a sufficient doubt about the mental competency of an accused to stand trial.' " *Id.* (quoting *Griffin v. Lockhart,* 935 F.2d 926, 929 (8th Cir.1991)) (footnote omitted). "[This 'procedural' competency] principle operates as a safeguard to ensure that the ['substantive' competency] principle is not violated." *Id.* (quoting *Griffin,* 935 F.2d at 929) (internal quotation marks

omitted). The issues arising in procedural and substantive competency claims are similar but distinct: "the issue in a substantive competency claim is whether the defendant was in fact competent to stand trial, but the issue in a procedural competency claim is whether the trial court should have conducted a competency hearing." *Id.* at 590–91.

### A. Procedural Competency Principle

■■■ Procedural due process mandates that a court hold a hearing when there is a sufficient doubt about the defendant's mental competency to stand trial. *Vogt,* 88 F.3d at 590. The Eighth Circuit Court of Appeals has determined that if there is "sufficient doubt" regarding the defendant's competency, the court must order a hearing *sua sponte. Griffin,* 935 F.2d at 929. " 'Failure to provide an adequate hearing on competency ... deprives a defendant of his due process right to a fair trial.' " *Id.* at 930 (quoting *Beans v. Black,* 757 F.2d 933, 935 (8th Cir.1985)). An adequate competency hearing "requires the presence of the defendant and his counsel, the opportunity to be heard, to offer evidence, and to test the evidence." *United States v. Day,* 949 F.2d 973, 982 (8th Cir.1991).

■■■ The precise type and quantity of evidence necessary to establish a "sufficient doubt," and thus mandate a competency hearing, is uncertain. *Griffin,* 935 F.2d at 930 (citing *Drope,* 420 U.S. at 180, 95 S.Ct. 896). The factors which go into the determination of "sufficient doubt" include: " 'any evidence of [the defendant's] irrational behavior, [the defendant's] demeanor before the trial court, available medical evaluations, and whether trial counsel questioned the defendant's competency before the court.' " *Vogt,* 88 F.3d at 591 (quoting *Day,* 949 F.2d at 982). "[A]n express doubt by the attorney of the ac-

cused is a legitimate factor to consider, but alone is not enough to create sufficient doubt." *Griffin*, 935 F.2d at 930 (citing *Drope*, 420 U.S. at 177 n. 13, 95 S.Ct. 896). The extent and quality of a defendant's participation in court proceedings is highly relevant to the issue of whether there exists "sufficient doubt" as to the defendant's competency to stand trial. *Day*, 949 F.2d at 983. " 'Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.' " *United States v. Robinson*, 253 F.3d 1065, 1068 (8th Cir.2001) (quoting *Drope*, 420 U.S. at 181, 95 S.Ct. 896).

▮▮▮▮ Looking retrospectively, the question of whether the court was required to hold such a hearing " 'depends on whether [the defendant's] mental competency was in question at the time [of his trial].' " *Weisberg v. Minnesota*, 29 F.3d 1271, 1276 (8th Cir.1994) (quoting *United States v. Hollis*, 718 F.2d 277, 280 (8th Cir.1983) (affirming district court's denial of motion to withdraw guilty plea where defendant relied on psychiatric report that was submitted after plea and before sentencing)). "Absent some contrary indication, state and federal trial judges are entitled to presume that defendants are competent." *Day*, 949 F.2d at 982 (citing *Smith v. Armontrout*, 865 F.2d 1502, 1506 (8th Cir.1988 (en banc))). Thus, the defendant bears the burden of demonstrating the trial judge "failed to see the need for a competency hearing when, based on the facts and circumstances known to [her] at the time, [she] should have seen such a need." *Day*, 949 F.2d at 982 (citing *Drope*, 420 U.S. at 174–75, 95 S.Ct. 896; *Collins v. Housewright*, 664 F.2d 181, 183 n. 6 (8th Cir.1981)).

▮▮▮▮ In this case, there was no indication Denton's competency should have been questioned, let alone an indication rising to the level of a "sufficient doubt" as to Denton's competency. The court observed Denton's demeanor in court for two days during trial and watched Denton testify. Denton gave no indication that he was not competent to stand trial or to assist in his defense. To the contrary, he testified in his own defense and answered questions on direct and cross-examination. Furthermore, Denton gave no indication his condition had changed during the course of the trial; neither did his demeanor raise sufficient doubt about his mental competency. The court was unaware of any prior medical opinions regarding Denton's mental competency. Denton did not act irrationally. Mr. Clausen had the best opportunity to observe Denton's participation in his own defense and he did not raise the issue prior to or during trial. Rather, Mr. Clausen was aware of Denton's injury and did not believe such injury impeded Denton's competency to assist in his defense. Denton's family members, aware that Denton had been charged and would be tried in federal court, never indicated to Mr. Clausen any concerns that Denton might be incompetent to stand trial.[10] If Denton's family truly had been concerned about Denton's competency to stand trial

---

10. Michael Denton, Sr., submitted an affidavit in which he contends he did not know when Denton, his father, would be tried. However, Michael clearly knew when Denton's trial would take place because Michael testified for the defense. During his trial testimony, Michael stated he read about the charges in the newspaper. Therefore, the court finds that out of all of Denton's children, at least Michael knew about the charges, was aware of the dates of the trial, and could have met with Mr. Clausen prior to that time if he had concerns about Denton's competency.

and to assist in his defense but had been unable to meet with Mr. Clausen prior to trial, they could have informed Mr. Clausen or the court during trial of such concerns. Mr. Berger's current doubt as to Denton's competency at the time of trial, while a consideration, does not rise to the level of "sufficient doubt." The court ordered the post-conviction competency evaluations and a hearing on them out of an abundance of caution. Because Denton is unable to meet his burden of proving the court failed to see the need for a competency hearing in light of the facts and circumstances known to the court at the time of trial, the court finds Denton's procedural due process rights were not violated.

### B. Substantive Competency Principle

 Substantive due process prohibits a mentally incompetent defendant from being tried and convicted. *Vogt*, 88 F.3d at 590. In the context of a defendant's substantive due process claim that he was tried and convicted while mentally incompetent, the defendant bears the burden of demonstrating by a preponderance of the evidence that he was incompetent at the time of trial. *Id.* at 591. "[N]ot every manifestation of mental illness demonstrates incompetence to stand trial. . . . Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Id.* (quoting *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir.1995)) (quotation marks omitted). Instead, the Eighth Circuit Court of Appeals has determined:

> Due process mandates that [the defendant is] entitled to consult with his lawyer with a *reasonable* degree of rational understanding and therefore be accorded a fair trial—not a perfect trial. Although [the defendant's] cognitive deficits may have placed additional

responsibility on his counsel to ensure [the defendant's] understanding of the process, it certainly does not establish that he was incompetent to stand trial.

*United States v. Robinson*, 253 F.3d 1065, 1068 (8th Cir.2001).

 The court held a competency hearing on January 31, 2005 to determine whether Denton's substantive due process rights were violated in February 2003. Based upon the evidence presented to the court, the court finds Denton has failed to meet his burden of proving he was incompetent to stand trial in February 2003. The undersigned was the trial judge in this case. From the court's observation during a pretrial conference and trial, Denton had absolutely no difficulty understanding the proceedings and assisting his attorney with his defense. Even the cold record, the trial transcript, shows, without any doubt, Denton was able not only to understand and respond to his attorney's questions, but also to respond to the penetrating questions posed by the prosecutor in such a way that, had Denton been believed and the cooperating individuals disbelieved, he would have walked from the courtroom a free man. The court's observation of Denton during the trial revealed that Denton frequently and consistently consulted with his attorney during the trial and reacted appropriately to all the court proceedings. However, this court does not consider itself to be infallible and thus a detailed examination of the objective and subjective evidence received at the competency hearing is appropriate.

The best insight regarding the level of Denton's functioning prior to and during trial comes from his defense attorney. Christopher Clausen, Denton's trial attorney, is an experienced trial attorney with a background that includes the prosecution and defense of criminal defendants. He is

schooled in the attitudes shown and decisions made by those accused of crimes and seeking to avoid conviction. He has had dealings with persons who have sustained brain injuries. He was aware prior to trial that Denton had sustained a brain injury even though he might not have had every medical record that was in existence. From time of appointment to the conclusion of the trial, Mr. Clausen met with Denton in person many times and talked with him many other times by telephone. Mr. Clausen testified that had there been any indication that Denton was not understanding the proceedings or that Denton was having difficulty participating in the defense of his case, Mr. Clausen would have brought the issue to the attention of the court and requested that Denton be examined. To maximize Denton's understanding and participation, Mr. Clausen, as is his usual practice, wrote summaries of the developments in Denton's case and used those as a springboard in conversations with Denton about his case. Mr. Clausen testified that he did go over information with Denton multiple times and fully described what the government's evidence was and what evidence Denton could present. Mr. Clausen discussed the plea agreement offered by the United States and explained to Denton the ramifications of pleading guilty and the ramifications of being found guilty by a jury. In the opinion of Mr. Clausen, Denton's decision not to plead guilty and instead to take the chance that the jury would acquit him was based on Denton's inability to admit that he was a participant in a criminal offense and his disbelief that any jury would convict him based on the testimony of cooperating individuals with significant criminal histories. As Mr. Clausen noted, Denton's position was not that unusual when compared with those of other defendants Mr. Clausen has represented. Mr. Clausen's legal assistant at the time, Danielle Plaehn, also noted that Mr. Clausen's practice was to provide written summaries of case progress for his criminal clients, including Denton. She agreed with Mr. Clausen that the problem with Denton arose from his lack of acceptance of his situation rather than from a lack of understanding. With regard to Denton's conduct during trial, Mr. Clausen testified he and Denton conferred throughout the trial about the evidence with Denton offering insight and suggestions regarding witness testimony. Denton decided to testify even after receiving information from the court regarding the ramifications of testifying.

The BOP's evaluation of Denton at the Federal Medical Facility at Butner supports the conclusion that Denton was mentally competent to stand trial. During his extended stay at the Federal Medical Facility, Denton was cooperative and was able to relate extensive details regarding social, medical and criminal history. His mood and affect were appropriate. He reported anger and sadness about his legal situation. He reported to the interviewers that his case was "hopeless." The examiners noted that he spoke slowly and his expressive and receptive language abilities were normal. He exhibited logical and organized thought. He was at all times alert and oriented. His memory functioning was intact for immediate, recent and remote recall. Denton conducted himself appropriately with the other residents. He was appropriately groomed. Denton had no difficulty with daily activities and oriented himself to his new surroundings, moving around the hospital without any assistance. He remembered his appointments. He denied any hallucinations and delusions and there was no indication of any thought disorder in form or content. Denton was given a battery of tests which he was able to complete.

The WAIS–III was administered to Denton to test his cognitive/intellectual functioning. He achieved a full scale IQ score of 91 which corresponds to the average range of intellectual functioning. His verbal IQ score was better than his performance IQ score. His working memory index was in the high average range. Some of his indices were in the low average range such as verbal comprehension, perceptual organization and processing speed. Based on the test, the evaluators suggested his concentration, attention and short-term memory were his strengths. The evaluators attempted to validate the scores with another test, the VIP; however Denton did not put forth a good effort and did not answer some of the questions. The evaluators concluded it is possible that Denton's scores on assessments of cognitive functioning were not representative of his best efforts and the test results "may be an underestimate of his true intellectual abilities." It was noted however that the IQ score was consistent with testing done during the 2002 evaluation of Denton by Jane A. Springer.

Denton was given an MMPI–2 to assess his personality. His profile was deemed valid and interpretable. His profile showed a person who is mistrusting of others and believes others are trying to influence or control him. His profile suggests that he views the world as a threatening place and thinks others have unfairly blamed or punished him. Persons with similar profiles feel weak, tired and have difficulty concentrating. They report specific somatic complaints that often create difficulties coping with life. His profile suggests that he lacks necessary energy to deal with life's problems and is not interested in what goes on around him. His profile suggests he uses physical symptoms, real or imagined, to manipulate or control others. His profile is extremely masculine but suggests low ego strength.

As a result of difficulty coping with life, he may withdraw into fantasy. Individuals with this profile are often worried, tense, indecisive, agitated and anxious. The evaluators diagnosed him as having adult anti-social behavior. This label is used to describe criminal or other antisocial behavior undertaken for gain.

Dr. Weaver's first report included her opinion that on February 10 and 11, 2003, Denton was not suffering from a severe mental disease or defect and therefore was able to appreciate the nature, quality and wrongfulness of his actions. She concluded that at the time of trial, Denton understood the nature and the consequences of the proceedings against him. Due to lack of information concerning Denton's interaction with his attorney, Dr. Weaver was unable to conclude that Denton was able to assist in his own defense. In September 2004, Dr. Weaver was asked to consider additional information, including information provided by attorney Christopher Clausen, to determine whether or not Denton was competent at time of trial and issue a follow-up report. After receiving all the pertinent information available, Dr. Weaver concluded that Denton was able to assist and did assist his attorney in his own defense. Based on information Dr. Weaver received from Mr. Clausen, she concluded that although he tested in the low average range on memory assessments, Denton provided his attorney with information and insights that were not in the discovery materials. Denton was able to bring into their discussions information that Mr. Clausen had given him in prior meetings. She found it inconsistent that the Waterloo Police Officers whom Denton wanted to call as witnesses would not testify as Denton had described. As Mr. Clausen testified, this is not an usual situation. Frequently, persons identified by a defendant as potential witnesses are unwilling to

give the testimony the defendant expects. Although concern had been raised about Denton's ability to process information, Dr. Weaver relied on Mr. Clausen's statements to her that he did not have problems tracking information. She also noted the trial judge had observed Denton's appropriate responses during trial. With regard to the concerns about poor judgment, Dr. Weaver suggests that Denton had poor judgment before his injury as evidenced by his shady conduct as a police officer. Dr. Weaver's conclusion regarding the unwillingness to accept a plea offer after being advised of the implications of proceeding to trial are particularly on point: "While in retrospect it was not in Mr. Denton's best interest to go to trial, his reasoning about it was not irrational. According to Mr. Clausen, Mr. Denton thought it preposterous that convicted felons would be believed over a retired LEO [ (law enforcement officer) ]." After talking to Mr. Clausen, Dr. Weaver concluded that Denton participated in his defense throughout the trial, alerting Mr. Clausen to questions that should be asked, and that Denton behaved appropriately in the courtroom. With regard to the suggestion that Denton's testimony was verbose and not always direct and to the point, Dr. Weaver noted his testimony was rational and he could be redirected. She also noted Mr. Clausen's statement that defendants frequently answer the questions they wish they had been asked rather than the questions they actually were asked. In the first report, Dr. Weaver also suggested this type of response to trial questions can be an attempt to be deceitful and muddy the waters. Dr. Weaver disagreed with Ms. McCollum's opinion that Denton's statements that he believed he was aiding law enforcement showed cognitive and behavioral deficits. Dr. Weaver attributed his behavior to adult antisocial behavior and found Denton's statement that he was assisting law enforcement was self-serving.

Ms. McCollum is the only witness who offers an opinion that Denton was not competent to stand trial on February 10 and 11, 2003. The court gave her opinion very little weight for several reasons. First, Ms. McCollum does not have the education and training to evaluate legal competence. Second, Ms. McCollum has no experience in dealing with persons who have adult antisocial behaviors and/or are criminal defendants. Therefore, before reaching her conclusions, Ms. McCollum did not consider whether they were the result of Denton's antisocial tendencies. There is no indication that Ms. McCollum has ever observed a criminal trial, appreciates the complexities of criminal defense work or knows typical behavior of those accused of crimes. Third, Ms. McCollum did not observe Denton interact with Mr. Clausen or participate in the trial or even interview Mr. Clausen and Ms. Plaehn prior to offering her opinion. Her opinion was based primarily on her prior history with Denton and one hour spent with him recently at the Linn County Jail after his conviction and during the time he was attempting to establish grounds to have the verdict set aside. As for the affidavits of Denton's family members that Ms. McCollom considered, most were unspecific as to the time frame of the experiences and observations recounted, lacking in objectivity and obviously made by people with an interest in having the verdict set aside. Fourth, Ms. McCollom only saw Denton during times when it was in his best interest to appear significantly impaired. In 2001–2002, Denton was attempting to collect workers' compensation benefits. In 2003–2005, Denton was attempting to avoid a sentence of life in prison.

The court finds Denton was sufficiently able to consult with Mr. Clausen to a reasonable degree of rational understanding prior to and during this trial of Febru-

ary 10 and 11, 2003. The court further finds Denton had a rational and factual understanding of the proceedings against him at that time. Because Denton was not incompetent at the time of trial and conviction, the court finds Denton's substantive due process rights have not been violated. As such, there exist no grounds upon which to grant the relief Denton requests.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED:**

(1) Denton was competent to stand trial and to assist in his own defense February 10 and 11, 2003.

(2) Denton's procedural and substantive due process rights have not been violated.

(3) Denton's request that the court find him incompetent in February 2003 and remand him to the custody of the Attorney General for hospitalization and treatment is DENIED.

**SO ORDERED.**